

# TENNESSEE COMPTROLLER OF THE TREASURY

## COMPTROLLER'S INVESTIGATIVE REPORT

# Jackson-Madison County Metro Narcotics Unit

*April 1, 2022*

Jason E. Mumpower
*Comptroller of the Treasury*



DIVISION OF INVESTIGATIONS

Exhibit 1



# TENNESSEE
# COMPTROLLER
## OF THE TREASURY

JASON E. MUMPOWER
*Comptroller*

April 1, 2022

City of Jackson Officials
121 East Main Street
Suite 301
Jackson, TN 38301

and

Madison County Officials
100 East Main Street
Jackson, TN 38301

Officials:

The Office of the Comptroller of the Treasury conducted an investigation of selected records of the Jackson-Madison County Metro Narcotics Unit, and the results are presented herein.

Copies of this report are being forwarded to Governor Bill Lee, the State Attorney General, the District Attorney General of the 30th Judicial District who was appointed as *Pro Tem*, certain state legislators, and various other interested parties. A copy of the report is available for public inspection in our Office and may be viewed at http://www.comptroller.tn.gov/ia/.

Sincerely,

Jason E. Mumpower
Comptroller of the Treasury

JEM/MLC

# INVESTIGATIVE REPORT

## Jackson-Madison County Metro Narcotics Unit

The Office of the Comptroller of the Treasury investigated allegations of malfeasance related to the Jackson-Madison County Metro Narcotics Unit. The Comptroller's Office initiated the investigation after the Office of the District Attorney General of the 26th Judicial District reported questionable cash-handling practices for seized money. The investigation was limited to selected records for the period from January 1, 2018, through September 30, 2021. The results of the investigation were communicated with the Office of the District Attorney General of the 30th Judicial District who was appointed as *Pro Tem* in this matter.

## BACKGROUND



The Jackson-Madison County Metro Narcotics Unit (JMCMNU) is a collaborative effort between the Jackson Police Department (JPD) and the Madison County Sheriff's Office (MCSO) to combat illegal drug activities within the community. Established in 1997 and preceded by now-disbanded Metro Narcotics of the 26th Judicial District Drug Task Force, JMCMNU is comprised of 15 personnel consisting of JPD officers, MCSO deputies, and various support personnel.



The JMCMNU *Procedure Manual* (manual) establishes policies and procedures that govern the unit. Chapter 32 of the manual – Interlocal Cooperation and Mutual Aid Agreement for the Jackson-Madison County Metro Narcotics Unit (Mutual Aid Agreement) - outlines the purpose, the organizational structure, and the financial matters of the unit. The Mutual Aid Agreement establishes a joint fund – Metro Narcotics Drug Fund – that is to be maintained by the City of Jackson Recorder's Office. This fund consists of government contributions, fines, grant proceeds, seizures, and forfeitures. Disbursements from the fund, approved through JMCMNU Division or Unit Commanders, can be used for unit-related purchases and activities and other purposes allowed by law, including drug enforcement operations, drug education, drug treatment programs, and nonrecurring general law enforcement expenditures.

A JPD Captain (captain) has managed the administrative aspects of JMCMNU seizures and forfeitures since 2010. In this capacity, the captain was responsible for handling seized money and properties and coordinating the legal dispositions of these assets. Part of her duties included obtaining and maintaining the custodianship of seized money, receiving settlement proceeds and various payments, and remitting those funds into the City of Jackson's bank account. The captain

coordinated with the City of Jackson Revenue Office to account for the deposits she made on behalf of the JMCMNU.



The captain used a safe located at JPD to temporarily store the funds in her custody until she could make a bank deposit. During our investigation, investigators observed that the captain was the only individual to have knowledge of the combination and access to the safe and its contents, as she was solely responsible for ensuring all funds were deposited to the City of Jackson's bank account. On March 5, 2021, after discovering that the captain stored a large amount of cash and had not made any deposits to the official bank account for an extended time period, JMCMNU management directed an inventory be performed of the contents of the safe. Money from the safe was turned over to the Revenue Office and subsequently deposited to the official bank account. It was determined that the captain had $399,531.26 in the safe, some of which she had in her custody and control since July 2019.

## RESULTS OF INVESTIGATION

- **A JPD CAPTAIN FAILED TO REMIT AND PROPERLY ACCOUNT FOR SEIZED MONEY, SETTLEMENT PROCEEDS, AND VARIOUS PAYMENTS TOTALING AT LEAST $15,027.50**

Our investigation revealed that between January 1, 2018, and September 30, 2021, the captain failed to remit and properly account for at least 11 transactions representing seized funds, settlement proceeds, and various JMCMNU-related payments totaling $15,027.50 in her sole custody and control as follows:

A. <u>Missing money totaled $6,639.</u>

When the captain received seized money into her custody or receipted settlement proceeds, the transaction would be documented on the *Evidence Form and Property Receipt* or a cash receipt. After reviewing applicable documentation associated with the transactions noted below, investigators determined that the captain was the last custodian of the funds. However, the captain could not provide any documentation that the funds were ever deposited to the official bank account, and the Revenue Office had no documentation associated with these transactions.

| Item # | Type of Transaction | Date Received by the Captain | Amount |
|---|---|---|---|
| 1 | Seized Money | 03/09/2018 | $5,654 |
| 2 | Settlement Proceeds (partial amount) | 01/28/2019 | 60 |
| 3 | Seized Money | 02/14/2019 | 620 |
| 4 | Seized Money | 02/14/2019 | 305 |
| | Total | | $6,639 |

B. <u>The captain found $1,088.50 one day after the meeting with investigators.</u>

On August 23, 2021, investigators met with the captain and discussed discrepancies with money in her custody. During the meeting, the captain stated that she had remitted all of the money, and she could not explain why the Revenue Office had no record of all of these transactions. Subsequent to this meeting, the captain informed investigators that she located the money associated with the transactions noted below in the JPD safe laying under some paperwork and other items on August 24, 2021. After investigators' inquiries regarding the whereabouts of the money on March 5, 2021, when the contents of the safe were originally inventoried, the captain stated that she overlooked the four envelopes in which the money was placed.

| Item # | Type of Transaction | Date Received by the Captain | Amount |
|---|---|---|---|
| 1 | Seized money | 04/11/2019 | $20.00 |
| 2 | Settlement Proceeds | 04/12/2019 | 500.00 |
| 3 | Tow Fee | 05/29/2020 | 62.50 |
| 4 | Seized money | 01/19/2021 | 506.00 |
| | Total | | $1,088.50 |

C. <u>Money and money orders the captain found and deposited after the March 5, 2021, inventory totaled $7,300.</u>

As stated above, on March 5, 2021, the contents of the safe were inventoried and the money was deposited into the official bank account. The subsequent deposit transactions noted below were not included in the inventoried items or in the March 5th deposit. Investigators questioned the whereabouts of this money in the captain's custody and control prior to and during the March 5, 2021, inventory since these funds should have been already deposited into the official bank account or at least part of the funds found in the safe.

| Item # | Type of Transaction | Date Received by the Captain | Date Deposited by the Captain | Amount |
|---|---|---|---|---|
| 1 | Settlement Proceeds | 09/18/2020 | 03/19/2021 | $3,500 |
| 2 | Settlement Proceeds | 11/20/2020 | 03/19/2021 | 2,000 |
| 3 | Seizure (Money Orders) | 08/13/2020 | 05/03/2021 | 1,800 |
| | Total | | | $7,300 |

3

TENNESSEE COMPTROLLER OF THE TREASURY                                                                                   Jackson-Madison County Metro Narcotics Unit

Regarding the $3,500 deposited on March 19, 2021, the captain could not remember the exact circumstances but stated the cash could have been kept in the seizure file at the impound lot. The captain stated that she thought she pulled the case file out to look at items to auction and found the envelope with the money. Regarding the $2,000 deposited on March 19, 2021, the captain stated that she placed the envelope with the money under her computer monitor, and she overlooked it and did not find it until March 2021. As for the $1,800 in money orders deposited on May 3, 2021, the captain stated the money orders were in a seizure file at the impound lot, and that she did not remember them until she found them later.

During the interview on August 23, 2021, the captain stated to investigators that she did not steal, borrow, or put back any money, and that she has turned in "every penny" she has ever collected to the Revenue Office.

### Summary of Money Discrepancies Under the Captain's Control and Oversight

| Type of Issue | Number of Transactions | Amount |
|---|---|---|
| A. Money That Remains Missing | 4 | $6,639.00 |
| B. Money Found One Day After the Meeting with Investigators | 4 | 1,088.50 |
| C. Money and Money Orders Deposited After March 5, 2021 | 3 | 7,300.00 |
| Total | 11 | $15,027.50 |

Investigators reviewed corresponding documentation associated with the 11 transactions with discrepancies from initial receipt, through the chain of custody in the JMCMNU process, and ultimately to the captain for deposit. The captain was the last employee to have physical custody and control over the funds. Based on this review, interviews with department employees, including the captain, the captain was directly and solely responsible for the money discrepancies associated with the above transactions, including the $6,639 that remains unaccounted for and missing. As the last person to physically touch and account for the money, the captain could not account for the funds while in her custody nor provide investigators with any explanation as to what happened to the funds.

## INTERNAL CONTROL AND COMPLIANCE DEFICIENCIES

Our investigation revealed multiple deficiencies in internal control and compliance, some of which contributed to the discrepancies under the captain's control and oversight without prompt detection:

**Deficiency 1: JMCMNU officials failed to deposit some funds within three days of seizure**

Pursuant to *Tennessee Code Annotated*, Section 6-56-111, every municipal official handling public funds is required to deposit those funds as soon as practical, but no later than three working days

Case 1:22-cv-02689-MSN-jay   Document 1-1   Filed 10/07/22   Page 7 of 10
PageID 18

TENNESSEE
COMPTROLLER
OF THE TREASURY _____Jackson-Madison County Metro Narcotics Unit

after the receipt of those funds. The procedures established by the City of Jackson Recorder's Office are consistent with this statutory requirement and represent effective internal controls, sound business practices, and industry standards over how law enforcement agencies should handle seized money.

Based upon 292 seizures examined by investigators and related transactions included in the review, our investigation revealed excessive and unreasonable delays between the date of seizures and the date the money was ultimately deposited into the official bank account. During the period reviewed, the JMCMNU seizure process was initiated by drug investigators submitting the seized money at MCSO in a drop-off box. The following custodial process with the corresponding timeliness of each step in the process is noted below:

| Step 1 MCSO evidence tech would pick the money from the drop-off box | Step 2 Money would be retained in the MCSO money vault | Step 3 Money would be retained in the JPD safe prior to depositing into the bank | Overall number of days between the date seized money was dropped off at MCSO and the deposit date |
|---|---|---|---|
| Up to 7 days | Up to 108 days | Up to 609 days | |
| ← Captain's Oversight → | | | |

As the designated official with administrative oversight and custodial control of the legal process for all seizures and forfeitures, the captain was responsible for ensuring that JMCMNU complied with the statutory requirements regarding timeliness of depositing money to the official bank account. When investigators inquired about the excessive delays in making deposits, the captain stated she was aware of the 3-day deposit policy requirement, and that due to COVID-19, she could not use the drive-through at the bank to make deposits. Although the captain stated that she never had a problem with depositing money until 2020, investigators found evidence of excessive delays prior to 2020. The captain also told investigators she needed additional time to verify the accuracy of seizures prior to depositing the funds into the bank, and that she had asked her leadership for assistance to no avail. However, investigators were unable to substantiate these claims.

Investigators also questioned the lack of oversight by the captain's supervisory chain-of-command. Until recently when our investigation commenced, some members of the captain's management were either unaware that JPD used the safe for JMCMNU purposes, or that the captain stored large amounts of cash and failed to make deposits for extended periods of time. Some members of JMCMNU management also expressed a high level of trust and confidence in the captain's work over the seizures and forfeitures, which combined with the identified weak internal controls over these processes (refer to **Deficiency 2** below), represents an ideal environment for fraud to go undetected.

**Deficiency 2: JMCMNU officials failed to establish adequate internal controls over seized funds and certain processes**

We noted the following weaknesses in internal controls:

A. <u>Lack of Segregation of Duties</u>. In her capacity over JMCMNU seizures, the captain was responsible for maintaining physical custody of the funds, preparing accounting documentation that disclosed how much money was remitted to the bank and accounted for in the Revenue Office, overseeing and coordinating the legal disposition of cases associated with seizures, and records-retention of seizure files and documentation. If internal controls are to be effective, an adequate division of responsibilities among those who control accounting decisions and handle assets is necessary.

B. <u>Lack of Documentation Identifying Amounts Deposited</u>. After depositing funds into the official bank account, the captain would submit two documents to the Revenue Office, which were used to account for the deposits: 1) a bank deposit receipt (generated by a bank); and 2) a miscellaneous deposit form (generated by the captain). This system lacked documentation identifying the amounts deposited independent of the captain's control (e.g., submitting a copy of the evidence form justifying the amounts deposited). Our investigation also revealed instances of overages and shortages when comparing amounts deposited with actual seizure or evidence forms. Having a third-party review documentation in the process increases internal controls over seizures and decreases the risk of errors and fraud.

C. <u>Lack of Tracking Mechanism.</u> During the period reviewed, the captain was responsible for approximately $750,000 associated with seized funds and related transactions. However, the captain did not maintain any regular tracking mechanism (e.g., a spreadsheet) to account for funds that went through her custody. The captain told investigators she wanted to start a spreadsheet on seized funds, but the Revenue Office did not provide a starting date on the spreadsheet, so she never started one. Establishing a regular tracking mechanism over a high volume of transactions (seizures) is a fundamental business practice for reliable and effective internal controls.

D. <u>No Periodic Reconciliations Between JMCMNU and the Revenue Office.</u> No processes were implemented to periodically reconcile amounts seized and documented by JMCMNU with the amounts accounted for by the Revenue Office. A monthly reconciliation is an effective control mechanism that helps identify errors and irregularities and ensures the completeness and accuracy of transactions.

E. <u>Evidence Money Erroneously Deposited to the Official Bank Account.</u> Our investigation revealed instances when seized money that should have been retained as evidence for legal purposes was erroneously deposited to the official bank account, thus jeopardizing the legal outcome of the JMCMNU investigation. Implementing clearly established processes helps ensure that seized money intended for deposit and seized money intended to be retained as evidence are not comingled.

F. <u>Outdated JMCMNU Procedure Manual.</u> Until our investigation commenced, the JMCMNU procedure manual had not been updated since June 1998. Since 1998, the JPD safe had been moved three times, the money-handling processes pertaining to seizures had been changed to reflect the 3-day deposit requirement, and several management turnovers and structural changes within JPD over JMCMNU operations had occurred. However, some of the procedural changes in the manual had been revised only recently, with some language continuing to be outdated and in need of revisions. Additionally, prior to commencing our investigation, the majority of JMCMNU investigators have either never read the manual or were unaware that one existed. Policies are only effective if they accurately reflect desired processes, are periodically reviewed and updated by management, and the personnel are properly trained on the policies.

G. <u>Inconsistent and Noncompliant Processes by JMCMNU Investigators.</u> Our investigation revealed that in a majority of seizures, drug investigators submitted seized money at the MCSO; however, in certain instances, the JMCMNU investigators released seized money directly to the captain without first submitting the same at MCSO. In addition, seized money was not always counted by at least two drug investigators, as required by the policy manual.

H. <u>Inadequate Document Retention Practices.</u> After reviewing documentation in the seizure files, certain deposits could not be verified, or the amounts represented could not be determined with certainty. In addition, the captain did not establish a uniform document retention system to justify the transactions she handled, thereby ensuring that each transaction could be supported by adequate supporting documentation.

I. <u>Weaknesses at the Impound Lot Regarding Custody and Disposition of Seized Properties.</u> On August 12, 2021, investigators visited the impound lot to inventory and confirm selected properties seized by JMCMNU. While all properties selected for our review could be accounted for, the following weaknesses were observed: 1) there was no uniform or reliable system in place to store, organize, label, and locate properties [**refer to Exhibit 1**]; 2) there was no system in place ensuring clear and distinct custodianship of the properties between personnel; 3) properties that were deemed unserviceable or had already been awarded to JMCMNU were kept at the impound lot without an attempt to dispose of them in a timely manner; and 4) no policy guidance existed establishing disposition procedures over the seized properties or over procedures when attempting to sell properties on the GovDeals website.

TENNESSEE
COMPTROLLER
OF THE TREASURY _____Jackson-Madison County Metro Narcotics Unit

**Exhibit 1**



*Property seized by JMCMNU retained at the impound lot. Investigators observed weaknesses in the storage methods such as no labeling and poor organization.*

The Office of the Comptroller of the Treasury performed an investigative audit of JMCMNU operations during 2005 and issued a report in 2006, noting some similar findings and weaknesses regarding seized money that our investigation again revealed in 2021. These issues represent root causes that contributed to money discrepancies found under the captain's oversight and control.

JMCMNU officials indicated that they have corrected or intend to correct these deficiencies.